HERCULES & CO., LTD., Appellant,

v.

SHAMA RESTAURANT CORP.,
et al., Appellees.

No. 90–CV–593.

District of Columbia Court of Appeals.

Argued March 16, 1992.
Decided Aug. 21, 1992.

Martin F. McMahon, Washington, D.C., with whom Susan Amstadter, Takoma Park, Md., was on the brief, for appellant.

Donna S. McCaffrey, with whom John B. Tieder, Jr., McLean, Va., was on the brief, for appellee Shama Restaurant Corp.

Before FERREN, SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

Hercules & Co. (Hercules), appeals from the confirmation of an arbitration award issued in favor of Shama Restaurant Corp., et al. (Shama).[1] Hercules contends that its dispute with Shama was not arbitrable (and therefore that the award was not properly confirmed) because both its contract with Shama and the arbitration clause contained therein had been fraudulently induced. It further argues that Judge Shellie F. Bowers erred on September 4, 1987, when he referred much of the dispute to arbitration and when he failed to conduct a trial on the merits before dismissing with prejudice Hercules' claim that the arbitration clause had been fraudulently induced. We affirm.

## I
## THE FACTS

This is the second time that Hercules has asked this court to resolve a dispute arising out of an ill-fated renovation project in Old Town, Alexandria, Virginia, which began in the summer of 1986. The circumstances underlying the dispute were set forth in detail in our first disposition of this case, *Hercules & Co. v. Shama Restaurant Corp.*, 566 A.2d 31, 33–34 (D.C.1989) (*Hercules I*), and will only be reiterated here to the extent necessary to dispose of the issues on appeal.

Briefly, Hercules alleged in its complaint that it had contracted with Shama in 1986 to renovate Shama's restaurant in Old Town. The contract contained both a general arbitration clause, stating that the parties agreed to have all disputes arising out of the project resolved by independent arbitrators, and a general integration clause, stating that the contract "constitute[s] the entire agreement between" the parties. Throughout this litigation, Hercules has maintained that during the contract negotiations Shama and its architect, Darrell Downing Rippeteau (Rippeteau), made a number of material misrepresentations on which Hercules claims to have relied in deciding to execute the contract and in specifically agreeing to the arbitration clause; the most important of these alleged misrepresentations was that Shama had the financial wherewithal to satisfy fully its obligations under the contract. Neither this nor any of Shama's other alleged parol

---

1. Judge Robert Shuker issued an order confirming the award on October 5, 1989. Judge Shellie F. Bowers issued an order on March 29, 1990, denying reconsideration of Judge Shuker's order.

representations, however, was included in the terms of the written contract, which was prepared on a standard form prescribed by the American Institute of Architects (AIA). When it later appeared to Hercules that some or all of these representations may not have been true, and when a number of other problems arose in the precarious relationship that had evolved among Hercules, Shama, and Rippeteau, Hercules walked off the construction site, leaving the project far from complete.

Hercules then filed a suit against Shama and Rippeteau in our Superior Court, seeking a variety of remedies including damages and rescission of the contract on the grounds, *inter alia,* of fraud and breach of contract. Shama responded with a motion to stay all judicial proceedings pending arbitration of the dispute pursuant to the terms of the contract. Hercules countered by claiming that the dispute was not properly arbitrable in that both the contract as a whole and its arbitration clause in particular had been fraudulently induced by intentional misrepresentations on the parts of Shama and Rippeteau. On September 4, 1987, the trial court, per Judge Bowers, dismissed with prejudice Hercules' claim that the arbitration clause itself had been fraudulently induced, on the grounds that Hercules' allegations as to that claim were insufficient as a matter of law to entitle it to relief or to a hearing. The court referred many of Hercules' remaining claims, including the question whether the contract as a whole had been fraudulently induced, to arbitration. Hercules filed an appeal from Judge Bowers' order, but this court, in *Hercules I,* ruled that an order staying

litigation pending arbitration was not immediately appealable. 566 A.2d at 38–39. We therefore dismissed Hercules' appeal without ruling on the merits of its fraudulent inducement claims.[2]

Prior to our dismissal of Hercules' original appeal, the dispute between Hercules and Shama proceeded to arbitration. The arbitral panel, after rejecting Hercules' claim that the entire contract had been fraudulently induced, ruled in favor of Shama in the amount of $150,015. Shama subsequently filed a petition in the Superior Court for judicial confirmation of the arbitral award pursuant to D.C.Code § 16–4313 (1989). Hercules responded with a motion to dismiss Shama's petition on jurisdictional grounds.[3] On October 5, 1989, Judge Robert Shuker denied Hercules' motion and entered an order confirming the arbitral award in favor of Shama. Hercules filed a motion for reconsideration,[4] and on March 29, 1990, Judge Bowers denied that motion.[5] We consider Hercules' instant appeal to be at once a reinstatement of its earlier appeal, which had been dismissed as premature in *Hercules I,* and a fresh challenge to the confirmation of the arbitral award.[6]

## II

### THE WAIVER ISSUE

■ As a preliminary matter, we consider Shama's contention that, in order to preserve for review the question of arbitrability, Hercules was required to reassert its claim of fraudulent inducement in a timely

**2.** We did, however, comment briefly in a footnote on some apparent difficulties with these claims. *See Hercules I,* 566 A.2d at 39–40 n. 16.

**3.** Hercules' motion to dismiss did not include any fraudulent inducement claims; indeed, it did not contain any affirmative defense or other substantive response to the merits of Shama's confirmation petition.

**4.** Hercules argued that once its motion to dismiss Shama's confirmation petition for lack of jurisdiction was denied it should have been given the opportunity to file an answer to the motion alleging various affirmative defenses,

one of which was that the arbitration clause had been fraudulently induced.

**5.** Judge Bowers ruled that Hercules had failed to challenge the substantive merits of the arbitration award within ninety days after its delivery, as required by D.C.Code § 16–4311(b) (1989), and that it had therefore waived any and all affirmative defenses it may have had with respect to the confirmation of the award.

**6.** *See Haynes v. Kuder,* 591 A.2d 1286, 1287 n. 1 (D.C.1991); *Poire v. Kaplan,* 491 A.2d 529, 531 (D.C.1985).

post-award motion to vacate,[7] even though the claim had earlier been raised and dismissed with prejudice. As support for its position, Shama cites the District of Columbia Uniform Arbitration Act, D.C.Code § 16–4311(b) (1989), under which a party seeking to vacate an arbitration award must apply to the Superior Court "within ninety days after delivery of a copy of the award to the applicant." Shama also cites this court's decision in *Walter A. Brown, Inc. v. Moylan*, 509 A.2d 98, 100 (D.C. 1986), according to which a party who fails "to urge grounds for vacation of [an arbitration] award within the ninety-day statutory limit ... waive[s] any right to challenge the award." In the present case, the decision of the arbitration panel was made final and delivered to the parties involved on December 6, 1988. Shama argues that because Hercules did not file a motion to vacate the award or otherwise raise any substantive defenses to its confirmation within ninety days of this date, Hercules waived any right it may have had to challenge the award. For three reasons, we find this contention to be without merit.

First, Shama's reliance on our holding in *Moylan* is misplaced. *Moylan* stands for the proposition that a party seeking to modify or set aside an arbitration award under §§ 16–4311 or 4312 is required to file an application urging grounds for such relief within ninety days of the award. The purpose of this rule is to ensure that a decision by an arbitrator becomes final without undue delay. It requires a party who challenges an arbitral award to put the opponent on notice as early as possible of the nature of the challenge. In the present case, however, Hercules raised the issue of fraudulent inducement in pre-award proceedings commenced under § 16–

4302,[8] which are not governed by the 90–day time limit, rather than under § 16–4311 or § 16–4312, and the reasoning of *Moylan* thus has no application.

After Shama moved to stay the lawsuit Hercules had originally brought against it, Hercules filed a memorandum in opposition in which it alleged that the arbitration clause had been fraudulently induced and was therefore unenforceable. Hercules repeated this allegation in Count XI of its amended complaint. This was sufficient to put Shama on timely notice of Hercules' objections to the arbitration clause and to preserve those objections for appeal.

Secondly, to adapt Gertrude Stein's famous line about a rose, a dismissal with prejudice is a dismissal with prejudice. In *Glick v. Ballentine Produce, Inc.*, 397 F.2d 590, 593 (8th Cir.1968), the court stated that

a dismissal of an action with prejudice is a complete adjudication of the issues presented by the pleadings and bars further action between the parties. Additionally, a dismissal for failure to state a cause of action is a final judgment on the merits sufficient to raise the defense of res judicata in a subsequent action between the parties.

When Judge Bowers concluded on September 4, 1987, that Hercules had failed sufficiently to allege in its complaint fraudulent inducement of the arbitration clause, and when he dismissed that claim with prejudice, he effectively barred Hercules from relitigating that issue after the arbitrators issued their award. Shama correctly argues that the losing party in an arbitration case is ordinarily permitted to raise a post-award fraudulent inducement claim, either

---

7. Or in a timely answer to Shama's petition for confirmation.

8. D.C.Code § 16–4302 (1989) reads as follows: (a) On application of a party showing an agreement [to arbitrate], and the opposing party's refusal to arbitrate, the Court shall order the parties to proceed with arbitration, but if opposing party denies the existence of the agreement to arbitrate the Court shall proceed summarily to the determination of the issue so raised and shall order arbitration

if found for the moving party, otherwise, the application shall be denied. (b) On application, the Court may stay an arbitration proceeding commenced or threatened on a showing that there is no agreement to arbitrate. Such an issue, when in substantial and bona fide dispute, shall be forthwith and summarily tried and the stay ordered if found for the moving party. If found for the opposing party, the Court shall order the parties to proceed to arbitration.

by filing a motion to vacate the award on that ground or by raising that issue in an answer to the prevailing party's motion to confirm.[9] For Hercules to have done so in this case, however, would have been futile in light of Judge Bowers' prior dismissal of that claim with prejudice; that decision was the law of the case. Hercules' failure to raise a timely post-award challenge therefore could not operate as a waiver of its right to oppose the award on the grounds of fraudulent inducement. Simply stated, "the law does not require the doing of a futile act." *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980), *quoted in Stack v. United States,* 519 A.2d 147, 156 (D.C.1986).

Finally, this appeal is before us for the second time. When Hercules initially sought to appeal from the order dismissing with prejudice Count XI of its complaint, we held that the question whether Hercules had alleged facts sufficient to state a claim of fraudulent inducement and to avoid arbitration was not ripe for review, because an order staying litigation pending arbitration is not immediately appealable; we expressly reserved the merits of that question for possible resolution in the event of an appeal from a final decision. *Hercules I,* 566 A.2d at 39–40 & n. 16. Now that the dispute has been arbitrated, the sufficiency of Hercules' allegations of fraud is squarely before us. *See Haynes v. Kuder, supra* note 6, 591 A.2d at 1287 n. 1 ("To challenge the ... order compelling arbitration, appellant properly appeals from the ... order ... confirming the eventual arbitration decision."); *cf. FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.,* 498 U.S. 269, ——, 111 S.Ct. 648, 652, 112 L.Ed.2d 743 (1991) (under federal law, premature appeal from order that lacked finality automatically ripens

once final judgment is entered). We therefore proceed to consider the merits of that challenge.

## III

### THE FRAUDULENT INDUCEMENT CLAIM

In Count XI of its complaint, Hercules alleged that the arbitration clause itself had been induced by fraud. In dismissing Count XI without leave to amend, Judge Bowers found that Hercules had not pleaded facts sufficient as a matter of law to support that claim. He concluded in substance that even though the complaint adequately alleged that Shama had intentionally misrepresented facts relating specifically to the arbitration clause, Hercules' allegations were inadequate to show that those misrepresentations were material or that its reliance on those representations had been reasonable. Hercules maintains that this ruling was error and that the judge should have held an evidentiary hearing on its fraudulent inducement claim. We do not agree.

### A. The Requirement of an Evidentiary Hearing.

Hercules is correct in stating that the threshold question whether an arbitration clause was validly concluded or fraudulently induced is one which the court must initially decide before referring a dispute to arbitration. *Haynes v. Kuder, supra* note 6, 591 A.2d at 1289–90; *American Fed'n of Gov't Employees, Local 3721 v. District of Columbia,* 563 A.2d 361, 362 (D.C.1989); *Poire v. Kaplan, supra* note 6, 491 A.2d at 532–33. We do not agree, however, with Hercules' contention that Judge Bowers failed adequately to consider this threshold question or that he was required to conduct a trial on the merits of Count XI before dismissing it with prejudice.

**9.** Hercules contends that because a post-award confirmation hearing is a summary proceeding allowing very limited discovery procedures, see Super.Ct.Civ.R. 70–I(b), such a hearing does not provide an appropriate forum to air a challenge to the merits of an arbitration award on the grounds that the agreement to arbitrate has been fraudulently induced. We recently rejected this argument in *Thompson v. Lee,* 589 A.2d

406, 411–14 (D.C.1991), where we ruled that claims of fraudulent inducement may be brought via (1) a post-award motion to vacate; (2) an opposition to a motion to confirm an arbitral award; and (3) prior to arbitration, in a *motion for stay of arbitration pending judicial proceedings or in opposition to a motion for stay of litigation pending arbitration.*

In *Haynes*, the plaintiff had alleged, in moving to stay arbitration, that the arbitration clause in her retainer agreement with her former attorney, Kuder, had been fraudulently induced. The trial court rejected that allegation and compelled arbitration without holding an evidentiary hearing on the issue of fraudulent inducement. On appeal, Ms. Haynes contended that this was error in that she was entitled to such a hearing. We affirmed, concluding that "the procedure to resolve 'denials of the existence of [an] agreement to arbitrate' under [D.C.Code § 16–4302(a) (1989)] mirrors the familiar summary judgment procedure." 591 A.2d at 1290.

Because the trial court in *Haynes* had the benefit of affidavits and other material outside the pleadings, we applied the standard for summary judgment under Super.Ct.Civ.R. 56 in evaluating the dismissal of Ms. Haynes' claim. 591 A.2d at 1290. Judge Bowers' decision, on the other hand, was based strictly on the submitted pleadings; our proper analogue on review of his dismissal of Count XI is therefore not Rule 56 but Super.Ct.Civ. Rules 12(b)(6) & 12(c). *See Bell v. Jones*, 566 A.2d 1059, 1060 (D.C.1989); *American Ins. Co. v. Smith*, 472 A.2d 872, 873–74 (D.C.1984). Under Rules 12(b)(6) and 12(c), a plaintiff is entitled to a trial of an issue of law or fact—including the issue whether an arbitration clause was fraudulently induced—only if the complaint alleges facts sufficient to support a claim upon which relief may be granted. *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 362–64 & n. 7 (D.C. 1984); *Healey v. Barker Found.*, 469 A.2d 1244, 1246 (D.C.1983); *Cole, Raywid & Braverman v. Quadrangle Dev. Corp.*, 444 A.2d 969, 972 (D.C.1982). Therefore, in determining whether the trial court erred in granting Shama judgment on Count XI of Hercules' complaint without conducting an evidentiary hearing on that claim, we must consider whether Hercules alleged facts in its complaint sufficient to withstand a motion to dismiss under Rules 12(b)(6) or 12(c). To do that, we first examine the legislative and judicial authority for enforcing agreements to arbitrate. We then consider the elements of common law fraud in the inducement and evaluate the adequacy of Hercules' pleadings against those elements.

## B. Judicial Enforcement of Commercial Arbitration Agreements.

The questions presented by Hercules are before us in a legislative and judicial climate in which the judiciary's past parochial prejudice against enforcing arbitration agreements, *see Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–20 & n. 6, 105 S.Ct. 1238, 1241–42 & n. 6, 84 L.Ed.2d 158 (1985), has been consigned to well-earned historical oblivion. Following "centuries of judicial hostility to arbitration agreements," *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974), the "federal courts have recognized a strong ... policy in favor of voluntary commercial arbitration, as embodied in the United States Arbitration Act." *Hanes Corp. v. Millard*, 174 U.S.App.D.C. 253, 265, 531 F.2d 585, 597 (1976). This policy is a "fundamental and powerful" one which "favors arbitration of disputes and narrowly constricts the scope of judicial intervention." *Id.* at 267, 531 F.2d at 599. The District has a statute similar to the United States Arbitration Act, *compare* D.C.Code §§ 16–4301 *et seq.* (1989) *with* 9 U.S.C. §§ 1 *et seq.* (1988), and we find the federal courts' application of the federal statute instructive as to how we should construe our own.

We have held that where there is ambiguity as to whether a matter is within the scope of an arbitrator's authority, any doubts are to be resolved in favor of arbitration. *Friend v. Friend*, 609 A.2d 1137, 1139 (D.C.1992); *Sindler v. Batleman*, 416 A.2d 238, 242 (D.C.1980). Indeed, "an order to arbitrate the particular [dispute] should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960). Where an arbitration

clause in a contract, on its face, covers all disputes involving the interpretation or application of a contract, the Court has held that "in the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail...." *Id.* at 584–85, 80 S.Ct. at 1353–54.

■ Arbitration provides parties with a speedy, private, and relatively inexpensive method of resolving their disputes and consequently helps to decongest the court system. *Hanes Corp., supra,* 174 U.S.App. D.C. at 265, 531 F.2d at 597; *Robert Lawrence Co. v. Devonshire Fabrics, Inc.,* 271 F.2d 402, 410 (2d Cir.1959), *cert. denied,* 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960). It is fundamentally a creature of contract, *Dean Witter Reynolds, supra,* 470 U.S. at 219–20, 105 S.Ct. at 1241–42, and parties to a contract should be held to the terms to which they have agreed. Indeed, arbitration often allows disputes to be resolved by experts in the field who are more familiar than most courts are with industry practices and who can therefore tailor procedures specifically suited to the circumstances of the particular industry. *Pearce v. E.F. Hutton Group, Inc.,* 264 U.S.App.D.C. 246, 249, 828 F.2d 826, 829 (1987).

It is true, however, that no party may be compelled to arbitrate a dispute which it has not agreed to arbitrate. *Hercules I, supra,* 566 A.2d at 43 n. 21; *A.T. & T. Technologies, Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648–49, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986). Moreover, a party which has been fraudulently induced into agreeing to an arbitration clause has not given its valid consent to this method of resolving disputes. But when the "fundamental and powerful ... policy that favors arbitration of disputes and narrowly constricts the scope of judicial intervention," *Hanes Corp., supra,* 174 U.S.App.D.C. at 267, 531 F.2d at 599, is considered together with the requirement that fraud be pleaded with particularity and proved by clear and convincing evidence, *see infra,* parties to arbitration

agreements should not be readily permitted to avoid them simply by invoking in their pleadings the pejorative cry of fraud.

## C. The Elements of Fraud in the Inducement.

■ As we explained in *Hercules I,* 566 A.2d at 39–40 n. 16, common law fraud is never presumed, and a plaintiff alleging it must do so with particularity and must prove it by clear and convincing evidence. Super.Ct.Civ.R. 9(b); *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). To be entitled to a trial on the merits of a fraud claim, a plaintiff must allege "such facts as will reveal the existence of all the requisite elements of fraud. Allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient." *Bennett,* 377 A.2d at 59–60; *Higgs v. Higgs,* 472 A.2d 875, 876–78 (D.C.1984).

■ At common law, the requisite elements of fraud were (1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation. *Bennett, supra,* 377 A.2d at 59. At least in cases involving commercial contracts negotiated at arm's length, there is the further requirement (6) that the defrauded party's reliance be *reasonable. Hercules I,* 566 A.2d at 39 n. 16; *Isen v. Calvert Corp.,* 126 U.S.App.D.C. 349, 353, 379 F.2d 126, 130 (1967); *Day v. Sidley & Austin,* 394 F.Supp. 986, 990 (D.D.C.1975).

■ Moreover, in order to obtain an evidentiary hearing on a claim of fraud in the inducement, a party seeking to avoid arbitration must allege in its pleadings facts that establish all the elements of fraud with respect to the arbitration clause in particular. A complaint alleging only that the entire contract was fraudulently induced is insufficient as a matter of law to avoid referral of the issue of fraud to arbitration. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402–04, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967).

#### D. Fraud in the Inducement of the Contract or Fraud in the Inducement of the Arbitration Clause.

In connection with the judicial policy which favors voluntary commercial arbitration and which seeks to constrain the ability of parties to circumvent arbitration agreements, the Supreme Court has held that a party seeking to avoid arbitration by raising a claim of fraudulent inducement must allege that the arbitration clause itself—rather than the contract as a whole—was fraudulently induced. *Prima Paint, supra,* 388 U.S. at 402–04, 87 S.Ct. at 1805–06. Hercules seems to contest this proposition. It argues, based on *Moseley v. Electronic & Missile Facilities,* 374 U.S. 167, 171–72, 83 S.Ct. 1815, 1817–18, 10 L.Ed.2d 818 (1963), that an allegation in its complaint that the arbitration clause was part and parcel of a "fraudulent scheme" perpetrated by Shama and Rippeteau with respect to the contract as a whole is sufficient to avoid referral of the entire case to arbitration. We disagree.

In *Prima Paint, supra,* the Supreme Court construed *Moseley* and "the plain meaning" of the United States Arbitration Act, as requiring a party who seeks to avoid arbitration on the grounds of fraudulent inducement to challenge the "making" of the arbitration clause itself, and not merely the making of the contract in which the arbitration clause is contained or the "scheme" by which both were allegedly negotiated. *Prima Paint* thus stands for the proposition that where a party to a contract containing a broad arbitration clause claims fraud in the inducement both of the arbitration clause itself and of the entire contract containing the arbitration clause, the court is to consider only the former claim. If the claim of fraud in the inducement of the arbitration clause proves meritless, then the court is foreclosed from considering the question of fraud in the inducement of the contract as a whole, but must leave that issue to be decided by the arbitrators. *See CBS Employees Fed.*

Credit Union v. Donaldson, Lufkin & Jenrette Sec. Corp., 912 F.2d 1563, 1566–67 (6th Cir.1990); *Rush v. Oppenheimer & Co.,* 681 F.Supp. 1045, 1048, 1050 n. 9 (S.D.N.Y.1988).

This point was effectively made in *Robert Lawrence Co., supra,* 271 F.2d at 410–11:

> The issue of fraud seems inextricably enmeshed in the other factual issues of the case. Indeed, the difference between fraud in the inducement and mere failure of performance … depends upon little more than legal verbiage and the formulation of legal conclusions. Once it is settled that arbitration agreements are "valid, irrevocable, and enforceable," … arbitration should not be denied or postponed upon the mere cry of fraud in the inducement, as this would permit the frustration of the very purposes sought to be achieved by the agreement to arbitrate, i.e., a speedy and relatively inexpensive trial before commercial specialists.
>
> … If [an] arbitration clause was induced by fraud, there can be no arbitration; and if the party charging this fraud shows there is substance to his charge, there must be a judicial trial of that question before a stay can issue…. *It is not enough that there is substance to the charge that the contract [as a whole] was induced by fraud.*

(Emphasis added). Similarly, in *Haynes v. Kuder, supra* note 6, 591 A.2d at 1290 & n. 6, we indicated that such a "bifurcated" proceeding is both obvious from and inherent in the structure and content of the District's Uniform Arbitration Act, D.C.Code § 16–4302 (1989) (quoted in full, *supra* note 8).

In the present case, Hercules alleged in its complaint that the "arbitration clause was a vehicle by which Rippeteau sought to perpetrate his fraud on Hercules and Shama.[10] Rippeteau intended that the arbitration clause … would virtually preclude Hercules from 'walking off the job' once

---

**10.** In this part of the complaint, Rippeteau is cast as the party engaging in fraud and Shama is described as one of Rippeteau's victims. Her-cules also alleges, however, that Rippeteau's false representations were made in his capacity as Shama's agent.

the project was begun. Additionally, Rippeteau knew that under arbitration, he would be more likely to [be able to] conceal his fraud, for, as Shama has intimated, discovery is non-existent or limited in arbitration."[11] Hercules alleged that it was "induced by the fraudulent representations to ... agree to the arbitration clause as it existed in the contract."

The complaint thus does not contain an allegation that Shama made a misrepresentation to Hercules about the content of the arbitration clause. Hercules did allege, however, that the arbitration clause was a specific subject of its dealings with Shama, that it wanted the clause out, and that but for the fraudulent representations by Shama, it would not have agreed to a contract containing such a clause (even though it might have accepted the same contract if it were judicially enforceable). Hercules further alleged that it opposed the inclusion of an arbitration clause because, by insisting on resolution of disputes through arbitration, Shama could take advantage of the limitations on discovery to negate Hercules' opportunity to prove Shama's unfair dealings.

Shama suggests, and Judge FARRELL in his concurring opinion concludes, that under any reasonable construction of Hercules' pleadings, the rule of *Prima Paint* effectively disposes of the case, because Hercules' only claim of fraud in the inducement applies to the contract as a whole and only incidentally to the arbitration clause itself. Hercules claims, on the other hand, that its complaint not only alleges fraud in the inducement of the entire agreement, but also contains sufficient independent averments focused on the arbitration clause in particular to entitle Hercules to an evidentiary hearing. Indisputably, under *Prima Paint,* if the claim of fraud in the inducement reaches the arbitration clause only insofar as that clause is alleged to be a part of the contract as a whole, then the entire case, including the issue of fraud, must be referred to arbitration. The question whether Hercules' pleading is sufficiently specific is not dispositive, however, for even if, as Hercules contends, the claim of fraud in the inducement is viewed as sufficiently focused on the arbitration clause,[12] we conclude, for reasons stated

---

**11.** As we noted in *Hercules I,* 566 A.2d at 43 n. 21, however, the fact is that Rippeteau never agreed to arbitrate any disputes.

**12.** Although Judge FARRELL's position that Hercules' complaint must be dismissed under *Prima Paint* is an appealing one from an equitable perspective—a party to an arbitration agreement should not be permitted to circumvent the purposes of arbitration simply by resort to artful pleading—we are reluctant to dispose of the case on this ground, for there is tension between this "broad" reading of *Prima Paint* and the Supreme Court's earlier decision in *Moseley, supra,* 374 U.S. at 170–71, 83 S.Ct. at 1817–18, which *Prima Paint* explicitly left undisturbed.

In *Moseley,* the plaintiff, a party to an agreement to arbitrate, had alleged that both the arbitration clause and the agreement as a whole had been secured by the same set of fraudulent representations. The United States Court of Appeals held that, under these circumstances, the claim of fraud must be submitted to arbitration, for "arbitration is not barred by an assertion that the entire contract was induced by fraud; there must be a specific claim that the arbitration provision itself was fraudulently procured." *Electronic & Missile Facilities v. United States,* 306 F.2d 554, 558 (5th Cir.1962). The Supreme Court reversed, however, because "the petitioner has attacked not only the subcontracts, but also the arbitration clauses contained therein, as

having been procured through fraud." *Moseley, supra,* 374 U.S. at 170–71, 83 S.Ct. at 1817–18.

In *Prima Paint,* 388 U.S. at 403–04, 87 S.Ct. at 1805–06, the Supreme Court held that where the alleged fraud goes to the agreement as a whole, and the making of the agreement for arbitration is not in issue, the question of fraud must be decided by the arbitrator rather than by the court. The Court recognized, however, that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it." *Id.* at 403–04, 87 S.Ct. at 1805–06. The Court explicitly stated that "[t]his position is consistent both with *Moseley* and with the statutory scheme." *Id.* at 404 n. 12, 87 S.Ct. at 1806 n. 12. *See also Scherk, supra,* 417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14; *Rush, supra,* 681 F.Supp. at 1049 (explicating interaction, in similar context, between *Moseley* and *Prima Paint*).

We recognize that several decisions cited by Judge FARRELL in his concurring opinion apparently support the proposition that when a party has alleged that both the contract and its arbitration clause have been induced by the same fraudulent conduct, the allegations must be heard by the arbitrators rather than by the court. *See, e.g., Bitkowski v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 866 F.2d 821, 823 (6th Cir.1987); *Bhatia v. Johnston,* 818 F.2d 418,

below, that the complaint cannot and does not sufficiently allege two essential elements of fraud, namely, materiality and reasonable reliance.

### E. Hercules' Pleadings.

To determine whether the trial court erred in concluding that Hercules had failed to allege facts sufficient to entitle it to an evidentiary hearing on the question of fraudulent inducement, we must further review the details of Hercules' complaint. Hercules alleged that on or about May 19, 1986, in the course of a discussion with Shama and Rippeteau about the terms of the renovation contract, its representative, one Tsintolas, specifically requested that Shama delete or modify the arbitration clause, as well as other provisions of the contract. Hercules claims to have been concerned, based on its experience with a prior project, that Shama would not have adequate financing for this one. Hercules apprehended that if it agreed to the arbitration clause, it might be left out in the cold without a full range of remedies in the event that Shama's financial resources failed. According to Hercules, Shama and Rippeteau refused to delete the arbitration clause, insisting that the bank financing the project would not permit any such changes in the standard form contract. Shama and Rippeteau allegedly attempted to assuage Hercules' fears concerning the arbitration clause by assuring Hercules that Shama had adequate financing for the project. Specifically, Shama and Rippeteau are alleged to have made the following representations:

A. Shama had ample money to complete the construction project, with adequate allowance for normal cost overruns of 10 percent or more;

B. the Shama construction loan had been approved on or before the bids on the construction contract were accepted, i.e., April, 1986;

C. Shama was depositing an additional $200,000 in a money market account at [American Savings Bank] to be used for construction, particularly for cost overruns;

D. Shama's construction loan was to be used exclusively for payment on the Hercules construction contract ...

Hercules also alleged that these representations were false and that Shama knew they were false when it made them. Hercules averred, for instance, that the construction loan was not approved until August, 1986, some two months after construction began. If this allegation is true, then Shama must have known on May 19, 1986, that it had not yet obtained the loan in question. Hercules also argued that Shama is presumed to know the state of its own finances, and that it therefore knew or should have known that it lacked adequate funds to pay for this project. Moreover, Hercules claimed that Shama knew or should have known that it had not deposited the $200,000 in the money market account and that the money being obtained from the bank could be used for items other than construction.

We are satisfied that the allegations in Hercules' complaint were legally sufficient with respect to four of the six requisite elements of fraud in the inducement of the arbitration clause. See page 923, *supra.* Although, as we have seen, the question is not free of difficulty, we are prepared to assume for present purposes that Hercules has adequately alleged that Shama made misrepresentations going "to the 'making' of the agreement to arbitrate." *Prima Paint, supra,* 388 U.S. at 404, 87 S.Ct. at 1806. Hercules has also sufficiently alleged that Shama knew those representations to be false, that Shama made them with the intent to deceive Hercules into signing the contract in spite of the presence of the arbitration clause,[13] and that

---

421–22 (5th Cir.1987); *Driscoll v. Smith Barney, Harris, Upham & Co.,* 815 F.2d 655, 659 (11th Cir.1987); *Schacht v. Beacon Ins. Co.,* 742 F.2d 386, 389–90 (7th Cir.1984). The opinions in these cases all focused on *Prima Paint,* however, and the writers did not discuss *Moseley,* in which the Supreme Court apparently rejected the very proposition for which these decisions are supposed to stand.

**13.** *See* Super.Ct.Civ.R. 9(b) ("intent ... may be averred generally").

Hercules actually relied on those representations in deciding to forego its opposition to the arbitration clause. We therefore turn to the two remaining, closely related elements of fraud, namely, materiality and reasonable reliance.

### F. The Arbitration and Integration Clauses and Their Consequences.

 Hercules contends that Shama's alleged oral misrepresentations regarding its financial resources, made during the negotiations which preceded execution of the contract, were material to the agreement between them, even though none of Shama's statements was included in the contract as signed. In order to evaluate this contention, as well as Hercules' related claim that its reliance upon these oral statements was justified, we must first assess the significance of that exclusion. If the contract was not a completely integrated instrument, additional assurances and promises made by one party to another during their negotiations are surely relevant if the trier of fact is to understand the entire arrangement. If, on the other hand, the parties intended the written contract to settle everything, such promises and assurances have far less, if any, significance. We must therefore determine whether or not the contract between the parties was integrated and, if it was, whether it was completely or only partially integrated.[14] To do so, we must ascertain the intent of the parties at the time they entered into the agreement. *Howard Univ. v. Good Food Servs.*, 608 A.2d 116, 126 (D.C.1992); *Ozerol v. Howard Univ.*, 545 A.2d 638, 641 (D.C.1988); *Mitchell v. David*, 51 A.2d 375, 377–78 (D.C.Mun.App.1947).

 The first and most important step in ascertaining that intent is examination of the contract itself. We have held that "if [a] document is facially unambiguous, its language should be relied upon as provid-

ing the best objective manifestation of the parties' intent." *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C.1984); *Bolling Fed. Credit Union v. Cumis Ins. Soc'y*, 475 A.2d 382, 385 (D.C.1984).

 In the present case, we have no difficulty in ascertaining the parties' intent from the terms of the agreement they executed. First of all, the agreement to arbitrate which Hercules signed was unconditional. Article 13 of the contract provides that

> all claims or disputes between [Hercules] and [Shama] arising out of or relating to the Contract Documents or the breach thereof shall be decided by arbitration. . . .

This clause does not say that disputes will be sent to arbitration only if Shama is financially sound, or if Shama deposits money into a certain bank account, or if Shama uses its construction loan exclusively to pay Hercules. On its face, the arbitration clause is complete and unambiguous. It specifies how disputes are to be settled (by arbitration) and does not provide for any exceptions or envisage any conditions.

The written document also contains a merger clause which states that the parties intended to enter into a single completely integrated agreement regarding the renovation project. Article 6 of the standard AIA contract between Hercules and Shama provides that

> [t]he Contract Documents, *which constitute the entire agreement between the Owner and the Contractor,* are listed in Article 7 and, except for Modifications issued after execution of this agreement, are enumerated as follows. . . .

(Emphasis added). After this clause, nine specific documents are enumerated: the Agreement, the General Conditions of the Agreement (which are actually Articles 7–

---

**14.** If [the parties to a contract] intended the writing to be a final expression of the terms it contains, but not a complete expression of the terms agreed upon—some terms remaining unwritten—the agreement is partially integrated. If the parties intended the writing to be a complete expression of all the terms agreed upon, as well as a final expression of the terms it contains, the agreement is completely integrated.

2 E. ALLAN FARNSWORTH, CONTRACTS § 7.3 at 198 (1990).

20 of the Agreement), the drawings and specifications relating to the construction site, supplementary general conditions, certain special conditions, and three addenda.

Article 7 of the contract further elaborates on the meaning of the term "contract documents" as it is used in Article 6:

> The Contract Documents consist of this Agreement with General Conditions, Supplementary and other Conditions, the Drawings, the Specifications, all Addenda issued prior to the execution of this Agreement, and all Modifications issued by the Architect after execution of the Contract.... *The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work.*[15]

(Emphasis added.) When coupled with the specific enumeration of which extrinsic items are part of the contract documents,[16] the italicized words in the two quoted passages establish beyond peradventure that the parties intended their written contract to be an expression not only of the final agreement as to the terms in the contract but also of the entire agreement they reached.[17] In other words, the contract between Hercules and Shama was completely, rather than partially, integrated.[18]

█ A completely integrated contract may not be supplemented with prior representations not ultimately included therein, even if those representations are not expressly contradicted by the contract itself. *Ozerol, supra,* 545 A.2d at 642. According to the parol evidence rule, "when the parties to a contract have reduced their entire agreement to writing, the court will disregard and treat as legally inoperative parol evidence of the prior negotiations and oral agreements." *Giotis v. Lampkin,* 145 A.2d 779, 781 (D.C.Mun.App.1958). In other words, when a court makes a determination that a contract is completely integrated, one consequence is that "no evidence may be introduced of prior (or contemporaneous) agreements or terms, whether consistent or inconsistent, within the scope of the written agreement." *Ozerol, supra,* 545 A.2d at 642; *see also Flippo Constr. Co. v. Mike Parks Diving Corp.,* 531 A.2d

15. The General Conditions consist of four pages of boilerplate terms prescribed by the AIA; the terms detail the respective rights and responsibilities of the Architect, the Owner, the Contractor, and the Subcontractors, and they contain provisions regarding arbitration, form of and timetable for payments, and other miscellaneous terms. The supplementary general conditions and the special conditions consist of terms which were not included in the boilerplate of the AIA standard form contract but which were agreed to specifically between Hercules and Shama. They are appended to the Agreement and set forth terms concerning a variety of issues relating to the renovation project. None of the oral representations which form the basis of this litigation was incorporated in any of the boilerplate or nonboilerplate terms of the contract.

16. The fact that certain extrinsic items are specifically described as being part of the contract documents and "necessary for" the project warrants the conclusion that no other extrinsic terms are part of or material to the contract.

17. *See* 2 FARNSWORTH, *supra* note 14, § 7.3 at 205–06 ("a recital that the writing 'contains the entire agreement of the parties' " has traditionally been given effect "as showing an intention that the agreement be completely integrated"); RESTATEMENT (SECOND) OF CONTRACTS § 209(3) (1981) ("Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression."). Whether the integration clause is fairly viewed as "wimpy," as Judge FARRELL suggests, (quoting *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.,* 910 F.2d 1540, 1546–47 (7th Cir.1990)—a case in which the integration clause is qualified by a provision reciting that past representations survive)—or as macho, because it leaves no room for consideration of side agreements regarding Shama's finances, its most important feature is that it renders the agreement completely, and not partially, integrated.

18. The parties' use of a standard form contract widely used in and generally accepted by the construction industry is further evidence that the contract is completely integrated. *See* RESTATEMENT (SECOND) OF CONTRACTS § 211(1) ("where a party to an agreement signs or otherwise manifests assent to a writing and has reason to believe that like writings are regularly used to embody terms of agreements of the same type, he adopts the writing as an integrated agreement"). The cover sheet of the AIA standard form contract indicates that "it has been approved and endorsed by the Associated General Contractors of America."

263, 269 (D.C.1987); *Stamenich v. Markovic*, 462 A.2d 452, 455 (D.C.1983). As we held in *1010 Potomac Assocs., supra,* 485 A.2d at 210, the purpose of the parol evidence rule "is to promote the stability of transactions by preventing disgruntled parties from avoiding obligations by alleging oral understandings that conflict with their written agreements when those agreements were reduced to writing in order to forestall just such contentions."

### G. The Materiality of Shama's Alleged Misrepresentations.

Hercules claims that it considered Shama's representations regarding its financial wherewithal so important that it made them a regular subject of discussion in the contract negotiations and based its agreement to the contract on its reliance on them. None of these assurances of financial soundness made it into the written contract, however, while an integration clause effectively saying that "this is all there is" was included. As Hercules complains and therefore alleges, Shama and Rippeteau offered the form contract to it on a "take it or leave it" basis.

This court has held that evidence of negotiations conducted prior to the execution of a completely integrated contract is to be excluded because it is "immaterial to a decision on the merits." *1010 Potomac Assocs., supra,* 485 A.2d at 211. Moreover, we held in *Luther Williams, Jr., Inc. v. Johnson,* 229 A.2d 163, 165–66 (D.C. 1967), that if a judge concludes that a particular representation was superseded by the writing, "he does not decide that the excluded negotiations did not take place, but merely that *if* they did take place they are nevertheless legally immaterial." (Emphasis in original; citations omitted).

In applying the parol evidence rule, we have also held that, by definition, a completely integrated contract contains all the terms which the parties consider material and essential to the agreement. *Ozerol,* 545 A.2d at 641–42. This court has deemed

it "well established" that such a contract "must state all the promises of the parties with sufficient clarity and definiteness as to render the essential terms of the agreement clear without resort to parol testimony." *Easter v. Kass–Berger, Inc.,* 121 A.2d 868, 870 (D.C.Mun.App.1956).[19] *Accord, Educational Enterprises v. Greening,* 265 A.2d 287, 289 (D.C.1970); *Penick v. Frank E. Basil, Inc.,* 579 F.Supp. 160, 164 (D.D.C.1984).

The parol evidence rule does not apply when a party to a contract alleges that parol representations were fraudulently made. *Flippo,* 531 A.2d at 269; *Stamenich,* 462 A.2d at 455; *Giotis,* 145 A.2d at 781; RESTATEMENT (SECOND) OF CONTRACTS § 214(d). Courts have recognized, however, that this fraud exception would swallow up the rule if representations made during negotiations, but not included in the contract as executed, could be characterized as fraud and then used to undo an otherwise complete agreement. There is authority for the proposition that, at least in the absence of a showing that a parol representation made during negotiations by a party to a completely integrated contract was omitted from the contract by fraud, mistake, or accident, *see Bardwell v. The Willis Co., Inc.,* 375 Pa. 503, 506–507, 100 A.2d 102, 104 (1953), the opposing party is barred from relying on such a representation as material to its acceptance of the deal and from claiming that its reliance on it was reasonable.

The United States Court of Appeals for this Circuit recently adopted this approach in *One–O–One Enters. v. Caruso,* 270 U.S.App.D.C. 251, 848 F.2d 1283 (1988). In that case, the parties had executed a contract for the sale of a chain of restaurants. The contract contained an integration clause stating that the written agreement "superseded any and all previous understandings and agreements." *Id.* at 254, 848 F.2d at 1286. One–O–One claimed that, during the contract negotiations, Ca-

---

**19.** With respect to the "materiality" element of a fraud claim, "material" and "essential" have the same meaning. *See Northern Heel Corp. v. Compo Indus.,* 851 F.2d 456, 463 (1st Cir.1988)

(materiality "is not what a disappointed party says it is" but "demands an objective crossmatching of the significance of a fact to the essence of the transaction").

ruso had made fraudulent and material representations to induce One–O–One to sign, but the parties did not include these representations in the contract. In an opinion by Judge Ruth Ginsburg, the court, applying District of Columbia law relating to common law fraud,[20] held that One–O–One had not alleged a valid claim of fraudulent inducement:

> Were we to permit plaintiffs' use of the defendants' prior representations ... to defeat the clear words and purpose of the Final Agreement's integration clause, "contracts would not be worth the paper on which they are written." *Tonn v. Philco Corp.,* 241 A.2d 442, 445 (D.C. 1968) [quoting *Upton v. Tribilcock,* 91 U.S. 45, 50, 23 L.Ed. 203 (1875)]. On a matter of such large significance to the parties' bargain, silence in a final agreement containing an integration clause—in the face of prior explicit representations—must be deemed an abandonment or excision of those earlier representations....
>
> Plaintiffs cannot overcome the written instrument here, and, particularly, the integration clause, by invoking the fraud-in-the-inducement exception to the parol evidence rule. The exception for a party who "has been induced by a fraudulent misrepresentation to enter the contract," *Giotis,* [*supra,* 145 A.2d at 781], must not be stretched or inflated in a way that "would severely undermine the policy of the parol evidence rule, which is grounded in the inherent reliability of a writing as opposed to the memories of contracting parties." *Tonn,* [*supra,* 241 A.2d at 445]. We need not belabor the point. We have here the case of a party with the capacity and opportunity to read a written contract, who has executed it, not under any emergency, and whose signature was not obtained by trick or artifice; such a party, if the parol evidence rule is to retain vitality, cannot later claim fraud in the inducement.

*Id. See also Tonn v. Philco Corp.,* 241 A.2d 442, 445 (D.C.1968) (plaintiff who received an oral offer containing certain terms followed by a written offer which did not mention these terms, and who signed the written offer containing an integration clause, was bound by the contract and could not claim fraudulent inducement); *Jackvony v. RIHT Fin. Corp.,* 873 F.2d 411, 415–16 (1st Cir.1989); *Robinson v. Cupples Container Co.,* 513 F.2d 1274, 1277–78 (9th Cir.1975) (when plaintiff asked defendant to include in the written agreement specific representations defendant had made during negotiations, and when defendant refused to do so, the representations were not material for the purposes of plaintiff's fraud claim).

In *Bardwell, supra,* concededly a decision which has generated its fair share of controversy,[21] the Supreme Court of Pennsylvania was confronted with a commercial tenant's claim that the landlord's representative had made fraudulent oral representations regarding the leased property. The tenant contended that the alleged fraud took the case outside Pennsylvania's parol evidence rule. For reasons that seem to us to make some practical sense, the unanimous court would have none of it:

> There is not the slightest doubt that if plaintiffs had merely averred the falsity of the alleged oral representations, parol evidence thereof would have been inadmissible. Does the fact that plaintiffs further averred that these oral representations were *fraudulently made* without averring that they were *fraudulently* or by accident or mistake *omitted* from the subsequent complete written contract suffice to make the testimony admissible? The answer to this question is "no"; if it were otherwise the parol evidence rule would become a mockery, because all a party to the written contract would have to do to avoid, modify or nullify it would be to aver (and prove) that the false representations were *fraudulently made....* Fraudulent

---

20. One–O–One's complaint also alleged violations of the federal Securities Exchange Act, but the passage quoted in the text that follows related to the claim of common law fraud.

21. *See, e.g., Betz Labs, Inc. v. Hines,* 647 F.2d 402, 405–08 (3d Cir.1981).

misrepresentations may be proved to modify or avoid a written contract if it is averred and proved that *they were omitted* from the (complete) written contract by fraud, accident or mistake.

*Id.* 375 Pa. at 507, 100 A.2d at 104 (emphasis in original). *See also Contractor Utility Sales Co. v. Certain–Teed Prods. Corp.,* 638 F.2d 1061, 1080–81 (7th Cir.1981); *Nicolella v. Palmer,* 432 Pa. 502, 505–509, 248 A.2d 20, 22–23 (1968). There is no evidence in the present case that assurances regarding Shama's financial condition were omitted from the agreement by fraud, accident, or mistake; rather, they were excluded because, as Hercules alleges and thus acknowledges, it was given a form contract and invited to take it or leave it.

It is true that some courts are more permissive vis-a-vis such claims of fraud in the inducement, especially in cases brought pursuant to anti-fraud securities statutes. It has been held that, even when a contract contains a merger clause, a party to it may successfully base a fraudulent inducement claim on prior oral representations not included in the contract. *See, e.g., Astor Chauffeured Limousine Co., supra* note 17, 910 F.2d at 1546–47; *Rowe v. Maremont Corp.,* 850 F.2d 1226, 1233–36 (7th Cir.1988).[22] Nevertheless, because *One–O–One* is an opinion of the federal court of appeals for this circuit, and because the relevant portion of the opinion applies District of Columbia contract law rather than federal securities law, we must give it respectful consideration. *See Hornstein v. Barry,* 560 A.2d 530, 536–37 n. 15 (D.C.

1989) (en banc) (following a decision by our federal colleagues across the street "both on the basis of its reasoning and in the interest of harmony between court systems and uniformity of result in the same geographical area").

■ We need not, however, decide whether we should follow cases like *One–O–One* and *Bardwell* in the generality of "fraud in the inducement" disputes. The present controversy presents circumstances in which the policies against circumventing the parol evidence rule are especially compelling. Hercules is seeking to avoid an arbitration clause. If a party to an arbitration agreement, like Shama here, must litigate extensively in order to avail itself of this simplified method of resolving disputes, the purposes of arbitration are substantially undermined. A strict application of the concept of materiality is therefore appropriate, lest arbitration be thwarted at the outset "upon the mere cry of fraud in the inducement." *Robert Lawrence Co., supra,* 271 F.2d at 410.

Accordingly, Hercules' invocation of fraud to force an evidentiary trial before arbitration can proceed should be judged against a very high standard. Under that standard, once Hercules signed its name to an instrument which did not contain the assurances which it says it considered critical, it must be precluded (at least in the absence of evidence that the representations were omitted from the agreement by fraud, mistake, or accident) from thereafter claiming that those representations were "material" in the sense required to support a claim of fraudulent inducement

**22.** It is worth noting that both of these decisions, although concededly differing in tenor from *One–O–One,* are distinguishable in significant respects from the present case. In *Astor Chauffeured Limousine,* the case in which Judge Easterbrook described an integration clause with language similar to ours as "wimpy," 910 F.2d at 1545, paragraph 8 of the same contract provided that "all representations and warranties of the parties survive the closing of the transactions contemplated hereby." Moreover, the case was brought under the federal securities laws, which "are designed to induce the person who possesses information to reveal it accurately. The obligation rests with the speaker, not the listener." *Id.* at 1546.

*Rowe* was also a case brought pursuant to the securities laws. The court held, in that context, that the plaintiffs' failure to put into the written contract oral assurances by the defendants could raise an inference that the plaintiffs were not concerned about the subject matter of the representations, but that while this "may show poor judgment ... it does not necessarily preclude reliance." 850 F.2d at 1237.

Nevertheless, as Judge FARRELL points out in his concurring opinion, some courts and commentators would recognize a broader exception to the parol evidence rule for fraud in the inducement than cases like *One–O–One* and *Bardwell* would.

of the arbitration clause. Given the judicial favor accorded to agreements to arbitrate, we think that even those courts which would view *One–O–One* and similar cases as going too far on their facts might well be more exacting in evaluating the sufficiency of the complaint where, as here, the efficacy of a voluntary arbitration clause is imperiled.

This is not a case in which a powerful party forced a helpless supplicant into submission. We have no reason to doubt that Hercules and Shama, like the parties in *One–O–One*, were sophisticated business institutions dealing with each other on a level playing field. In attempting to explain why it did not see to it that Shama's assurances were included in the contract, however, Hercules told the trial court that it was "browbeaten" into accepting what it characterizes as the one-sided terms of Shama's proposed contract, and that it was not accorded an opportunity to incorporate any of its desired changes into the form contract. The judge responded to this argument quite appropriately:

> I don't put [Hercules] Corporation, or any other contractor like [Hercules], in the same situation [as] I would a little old family with ten kids [whose] house just burned down, and [who] are looking for another house, and [whose] real estate agent says, "Look, we have got [a house] here, but it [has] got some plaster falling, it [has] got this or that, but this is it, take it or leave it"; they have got to have a roof over the head of those kids at night, so they take it. You know the contract is [one of] adhesion in [that its terms are] all in favor of the landlord. Here [Hercules] could have just said, "Look, forget it, if I don't get this [in] ironclad writing ..., we are not going to sign the contract." ... I don't think Hercules was in such a limited bargaining position that it had to bow down, knuckle down, and sign this contract....[23]

We agree with the judge's view that, in light of the commercial context in which these two corporations were dealing, Hercules and Shama are presumed to have been negotiating with each other from equal bargaining positions. Hercules' complaint contains no allegation to the contrary. As the trial court held in *One–O–One Enters. v. Caruso*, 668 F.Supp. 693, 698 (D.D.C.1987), the decision later affirmed by the Court of Appeals in *One–O–One, supra,*

> [a]fter eight months of vigorous negotiations, the parties reached a final agreement that was lengthy, detailed, and comprehensive. During these eight months many offers, promises, and representations were made, and several preliminary agreements were drafted. To avoid a misunderstanding and to make clear that the only understanding between the parties was that expressed in the Agreement, the parties agreed that the Agreement "supersede[d] any and all previous understandings and agreements." ... Therefore, when the representations were superseded by the Agreement there was no representation upon which plaintiffs could base a fraud claim.

(Emphasis deleted).

As in *One–O–One*, the parties in the present case, each concededly represented by competent counsel, engaged in arm's length negotiations before reaching agreement. Each side presumably had the opportunity to make a variety of representations, promises, and offers. The parties ended up with a contract which did not include the representations which Hercules now says Shama made. If Hercules considered these assurances important enough to induce it to agree to the contract (including the arbitration clause), it could have conditioned its agreement on the explicit inclusion of those representations in the contract. If Shama or Rippeteau refused to go along, Hercules could have walked away from the deal. Since Hercules did

---

**23.** As Judge Bowers pointed out, "if Hercules was so concerned about the financial wherewithal of Shama Corporation [then it should have] said, 'We want something in writing.' ...

[T]here must have been some degree of concern about having something in writing that all of the parties could agree on with reference to the financial stability of Shama."

none of these things, but instead signed the contract and got the job, it is bound by the terms of the instrument to which it affixed its name, and cannot now be heard to complain that it was "browbeaten" or fraudulently induced into agreeing to arbitrate.

Hercules concedes that it "did not make the unequal bargaining position argument that the subcontractors in *Moseley* did." It contends, however, that this is not "crucial to Hercules' right to a trial on the merits of Hercules' claim of fraud in the inducement of the arbitration clause." We cannot agree. In order to be entitled to an evidentiary hearing on its claim of fraudulent inducement, Hercules must plead facts capable of establishing each of the requisite elements of fraud, including that of materiality. *Bennett, supra,* 377 A.2d at 59–60. The lack of any allegation that Hercules and Shama were negotiating from unequal bargaining positions effectively disposes of Hercules' claim of materiality, and is therefore crucial to the question whether Hercules has a right to an evidentiary hearing.[24]

### H. The Reasonableness of Hercules' Reliance on Shama's Alleged Statements.

We likewise conclude that the trial court properly ruled that Count XI of Hercules' complaint insufficiently alleged the final element of fraud, that of reasonable reliance. As Hercules concedes in its brief to this court, a party alleging that it was defrauded, at least in the context of commercial dealings at arm's length,[25] must establish not only that it actually relied on a false representation, but also that its reliance was objectively reasonable.[26] *One-O-One, supra,* 270 U.S.App. D.C. at 254, 848 F.2d at 1286; *see also Isen, supra,* 126 U.S.App.D.C. at 353, 379 F.2d at 130; *Democratic Nat'l Comm. v. McCord,* 416 F.Supp. 505, 508 (D.D.C.1976); 1 FARNSWORTH, *supra* note 14, § 4.14 at 418.

In dismissing Count XI, Judge Bowers ruled that Hercules had failed sufficiently to allege that its reliance on Shama's alleged misrepresentations had been reasonable. As he pithily stated, "the one that really hangs me up is the reasonable reliance." Hercules, in alleging that it had actually relied on Shama's representations, stated only that if it had "known of the true financial arrangements between Shama and [American Savings Bank], Hercules might still have entered into the contract, but would not have agreed to arbitrate its disputes. In fact, Hercules might have agreed to do the contract in phases, depending on the availability of money." We

---

**24.** "It should be emphasized that we are not faced with a contract of adhesion or negotiations in which one of the parties had a significant bargaining advantage.... The negotiations in question involved arm's length bargaining by experienced businessmen who were represented by counsel. The decision on the materiality of such an alleged representation might be different if these elements were absent."
*Robinson, supra,* 513 F.2d at 1278.

**25.** There is support for the proposition that in actions by consumers against entrepreneurs who obtain those consumers' business or money through fraud, the requirement that reliance be reasonable has been eliminated. *See, e.g., King v. Industrial Bank,* 474 A.2d 151, 156 n. 4 (D.C. 1984); *Saylor v. Handley Motor Co.,* 169 A.2d 683, 685 (D.C.Mun.App.1961); *Bob Wilson, Inc. v. Swann,* 168 A.2d 198, 199–200 (D.C.Mun.App. 1961). In such cases, one party deals with another from a considerably superior bargaining position, and the doctrine of "let the buyer beware"—of which the reasonable reliance requirement is an essential part—has been re-

placed by the doctrine of "let the liar beware," and the defrauding party is held responsible for its fraudulent acts even if the consumer may have been exceptionally naive in relying on the oral representations. *Harris v. M & S Toyota, Inc.,* 575 So.2d 74, 77–78 (Ala.1991). In the commercial arena, however, parties are generally presumed to deal with each other at arm's length, and the doctrine of *caveat emptor* (or here, *caveat contractor*) is, quite properly, still alive and well.

**26.** The requirement of reasonableness is sometimes referred to as a requirement that the plaintiff have "a right to rely" on the representation, *McCarthy v. Cahill,* 249 F.Supp. 194, 196 (D.D.C.1966); 12 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1515A, at 484 (Walter Jaeger ed.1970), sometimes as a requirement that the plaintiff be "justified" in relying on the representation, *Remeikis v. Boss & Phelps, Inc.,* 419 A.2d 986, 990 (D.C.1980), and sometimes as a requirement that the plaintiff be "warranted" in relying, *Baker v. Baker,* 54 App.D.C. 214, 217, 296 F. 961, 964 (1924). We treat all of these expressions interchangeably.

agree with the trial court that neither this statement nor any other averment in Hercules' pleadings was sufficient as a matter of law to satisfy the requirement that Hercules' reliance on Shama's alleged misrepresentations must be reasonable.

Reasonableness of reliance is closely related to materiality. As Professor Williston has succinctly put it, "reliance is only justifiable if the fact misrepresented is material." 12 WILLISTON, *supra* note 26, § 1515C at 493.[27] Hence, the reasons for holding that Hercules' complaint was deficient as to the element of materiality apply equally to the question whether Hercules' reliance was reasonable. *See One–O–One, supra,* 668 F.Supp. at 699.

We find especially persuasive, with respect to this issue, the court's opinion in *Management Assistance, Inc. v. Computer Dimensions, Inc.,* 546 F.Supp. 666, 672 (N.D.Ga.1982) (applying Georgia common law and quoting *Invest Air, Inc. v. Swearingen Aviation Corp.,* No. C77–1841A (N.D.Ga. Apr. 11, 1979)), *aff'd mem. sub nom. Computer Dimensions, Inc. v. Basic Four Corp.,* 747 F.2d 708 (11th Cir. 1984):

> [E]ven if the parol evidence rule did not act to bar admission of statements which directly contradict the ... written terms of the contract, this Court would have to find that the plaintiff did not reasonably rely upon the defendant's prior oral assurances. Absent this element, fraud, in the legal sense, cannot exist....
>
> One cannot close his eyes and blindly rely upon the assurances of another absent some fiduciary relationship or emergency.... In the case at bar, the evidence ... clearly establishes that both [plaintiffs] read the written agreement and understood that it contained terms materially different from the purported oral assurances. *In such a situation, any continued reliance on the purported oral assurances was clearly unreasonable.*

(Emphasis added).[28]

Similarly, in a case in which the court decided that the plaintiff could not have reasonably relied on oral assurances which were not included in the final written contract, it was held that if the text of an agreement could be undermined on the basis of allegations of what took place during negotiations,

> [c]ontracts would become no more than presumptive statements of the parties' intentions, instead of legally enforceable agreements. And the give-and-take of negotiations would become meaningless if, after making concessions in order to obtain other contractual protections, a knowledgeable party is later able to reclaim what it had given away by alleging that it had, in fact, relied not on the writing but on the prior oral statements.

*Turner v. Johnson & Johnson,* 809 F.2d 90, 96 (1st Cir.1986); *accord, Rosenberg v. Pillsbury Co.,* 718 F.Supp. 1146, 1152–53 (S.D.N.Y.1989).

In light of these authorities, we agree with Judge Bowers' conclusion, based on the pleadings before him, that Hercules had failed adequately to allege the reasonableness of its continued reliance on Shama's parol representations after those representations were not included in the terms of the completely integrated contract. Moreover, Hercules is seeking to set aside an arbitration clause on the grounds of fraudulent inducement. Given the readiness of modern courts to enforce arbitration agreements, and their vigilance against maneuvers designed to circumvent them, a strict application of the concept of

---

**27.** At common law, the "requirement of materiality is usually met by showing that the misrepresentation would have been likely to have induced a reasonable recipient to make the contract." 1 FARNSWORTH, *supra* note 14, § 4.12 at 413; *see also TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Jackvony v. RIHT Fin. Corp., supra,*

873 F.2d at 415; RESTATEMENT (SECOND) OF CONTRACTS § 470.

**28.** Although in *Management Assistance, Inc.,* depositions had been taken, and although the quoted language is contained in an order granting a motion for summary judgment, we think the principles articulated by the court apply with equal force here.

reasonable reliance is appropriate in evaluating Hercules' claim of fraud.

## IV

## CONCLUSION

In 1986 Hercules and Shama entered into an agreement which provided that all disputes would be resolved by arbitration. The idea was to provide a relatively speedy, private, and inexpensive alternative forum which would avoid the travail of the judicial process. *See Hanes Corp., supra,* 174 U.S.App.D.C. at 265, 531 F.2d at 597; *Robert Lawrence Co., supra,* 271 F.2d at 410.

Shama's legitimate expectations of simplicity, privacy, and modest expense have already been thwarted. We have had six years of litigation before at least three trial judges, as well as two complicated trips to this court. The parties have doubtless spent many thousands of dollars and have spread their mutual recriminations throughout the record for all to see. Although Shama has been successful before the trial court, before this court, and before the arbitration panel, the simplified alternative dispute resolution to which the parties agreed has not yet disposed of the case.

Now, with all of that behind us, Hercules wants to have a trial on its claim of fraud before the arbitration award is given effect. If we were to accept its contentions, the parties undoubtedly would continue to litigate this case both in this court and in the Superior Court for the foreseeable future (if not beyond), with the Holy Grail of finality many many moons away. Moreover, Hercules demands such a result on the basis of what Shama is supposed to have promised orally in the negotiations which preceded the execution of the agreement, but which Shama refused to include in the agreement itself. If Hercules were permitted to avoid its obligation to arbi-

trate simply upon this "mere cry of fraud in the inducement," the reliability of agreements to arbitrate would be seriously undermined.

We therefore hold that Judge Bowers properly referred the dispute to arbitration. Similarly, Judge Shuker correctly confirmed the ensuing arbitration award.[29] Accordingly, the decisions appealed from must be, and each is, hereby

*Affirmed.*

FARRELL, Associate Judge, concurring in the result.

In my judgment, appellant's claim failed as a matter of law not because, as I think my colleagues hold, fraud can never be pleaded successfully in the face of a completely integrated commercial contract with an arbitration clause, but rather because—under *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)—Hercules failed to allege facts that if proven would have established that it actually relied on material misrepresentations in agreeing to the arbitration clause *specifically,* as opposed to the contract as a whole. *Prima Paint* thus requires that appellant's claim be submitted to arbitration.

Hercules alleged that "had [it] known of the true financial arrangements between Shama and ASB [the financing bank], [it] might still have entered into the contract, but would not have agreed to arbitrate its disputes"; and that "[it] was induced by the fraudulent representations made by Shama and Rippeteau to forego [its] desire to modify the arbitration clause in the contract and agree to the arbitration clause as it existed in the contract." The facts alleged in support of these contentions, how-

---

**29.** As we have noted in Part II of this opinion, Hercules did not timely urge any substantive grounds for vacating or modifying the arbitration award after that award had issued. Although this failure does not prevent us from considering the sufficiency of Hercules' pre-award attempt to avoid arbitration on the grounds of fraudulent inducement, it does effectively preclude a finding of any error in the trial court's post-award confirmation of the arbitral award. *See* D.C.Code § 16–4310 (1989) ("upon application of a party, the Court shall confirm an award, unless within the time limits hereinafter imposed grounds are urged for vacating or modifying or correcting the award, in which case the Court shall proceed as provided in" §§ 16–4312 to 4313).

ever, belie them completely. According to the complaint:

> On or about May 19, 1986, Mr. Tsintolas, on behalf of Hercules, met with Bernard Baudrand and Rippeteau. At that time, Mr. Tsintolas asked to modify the arbitration clause *and other provisions* contained in the proposed contract. *Mr. Baudrand and Rippeteau denied the request on the basis that ASB would not agree to any changes in the contract's general condition language and that Hercules had to take the contract as it was.* Mr. Tsintolas again asked about the terms of the Shama construction loan. Rippeteau said he personally confirmed the purpose of the loan with Mr. Stefani, which was for the Hercules' construction contract only. [Emphasis added].

Nowhere does Hercules contend that the financing bank, ASB, would have agreed to changes in the contract's General Conditions and thus that the italicized representation by Baudrand and Rippeteau was false and fraudulent. Nor does it allege that the contract was anything other than what these men represented it to be—a take it or leave it proposition. Thus, Hercules' own proof would have shown that it had to take the entire contract with its arbitration clause or no contract at all. Absent an element of overreaching or allegations of fact that relate the alleged misrepresentations directly to the arbitration clause, Hercules could not in these circumstances have been fraudulently induced to agree to the arbitration clause apart from the rest of the contract by the alleged misrepresentations of Shama and its agents. If it relied on their statements, it did not do so specifically in relation to the arbitration clause. At best, its evidence might have shown that it relied on them in agreeing to the arbitration clause *and every other clause* in the contract.

Thus Hercules' attempt to plead fraudulent inducement of the arbitration clause fails because the facts alleged would only prove fraudulent inducement of the entire contract—an arbitrable claim already decided in favor of Shama. As Hercules alleged no facts justifying the conclusion that it

relied on any misrepresentation in agreeing to the arbitration clause in particular, under *Prima Paint, supra,* it cannot avoid its contractual obligation to arbitrate. *See Schacht v. Beacon Ins. Co.,* 742 F.2d 386, 390 (7th Cir.1984) (under *Prima Paint,* where claim of fraud applies equally to all provisions of a contract containing an arbitration clause, court is precluded from addressing that claim); *accord Bitkowski v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 866 F.2d 821 (6th Cir.1987); *Bhatia v. Johnston,* 818 F.2d 418 (5th Cir.1987); *Driscoll v. Smith Barney, Harris, Upham & Co.,* 815 F.2d 655 (11th Cir.), *cert. denied,* 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987); *Russo v. Simmons,* 723 F.Supp. 220 (S.D.N.Y.1989).

My colleagues are unwilling to rest decision on this basis because they apparently find merit in a narrower interpretation of *Prima Paint.* See *ante* at 925–926 n. 12. As stated by the court in *Rush v. Oppenheimer,* 681 F.Supp. 1045 (S.D.N.Y.1988) (twice cited by the majority): "[A] court may order arbitration only when the party opposed to arbitration has *not* claimed that the arbitration agreement itself was fraudulently procured." *Id.* at 1049 (emphasis added). That is, only when the plaintiff has not taken care (through what can only be inadvertence) to ensure that its "allegations of fraud are directed at the contract as a whole *and at the arbitration clause in particular,*" *id.* (emphasis added), is judicial consideration of the fraud claim barred in favor of arbitration. This reading of *Prima Paint* seems to me quite inconsistent with the broad preference for enforcing arbitration clauses under modern law; and it places a premium on artful—even mechanical—pleading. Neither *Prima Paint* nor *Moseley v. Electronic & Missile Facilities,* 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963), requires it. *Prima Paint* held that "in passing upon [an] application for a stay while the parties arbitrate, a federal court may consider only issues [such as fraud] relating to the making and performance of the agreement to arbitrate," 388 U.S. at 404, 87 S.Ct. at 1806; it did not imply that when a plaintiff is

smart enough to direct the same allegation of fraud to both the contract as a whole and the arbitration clause, the court may adjudicate the broader claim as incidental to (or identical with) the narrower. "[T]he statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Id. Moseley* involved an allegation that the arbitration clause was a distinct means by which the defendant's fraud was to be effected, 374 U.S. at 171, 83 S.Ct. at 1817; and, as the Sixth Circuit has noted, *Moseley* had unique facts—"elements of a contract of adhesion or of a gravely difficult and inconvenient forum [created by the arbitration clause]." *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1279 (6th Cir.1990). Read sensibly together, *Moseley* and *Prima Paint* will forestall arbitration only when there is "a 'well-founded claim' that the arbitration clause itself, *standing apart from the agreement as a whole*, was induced by fraud." *Id.* (emphasis added). The present complaint has no such well-founded claim.

There is irony in the majority's shying from my reading of *Prima Paint* (shared by at least four federal courts of appeals) and instead letting the court decide appellant's claim of fraud, because the majority ends up relying on the same principles favoring enforcement of arbitration agreements that underlie *Prima Paint* to uphold dismissal here—though by a more circuitous and problematical route. The court engages in lengthy consideration of principles of integration, merger clauses, the parol evidence rule, materiality and reasonable reliance, only to suggest in the end that these principles may not be dispositive outside the particular context of an agreement to arbitrate and the unwillingness of courts to let arbitration "be thwarted at the outset 'upon the mere cry of fraud in the inducement.'" *Ante* at 924, 925 (citation omitted). My concern about this discussion is that the court's reliance on the integration clause in this agreement and the parol evidence rule will be cut loose in the future from the narrow arbitration context here and be used to cast doubt on substantial precedent in this jurisdiction regarding claims of fraudulent inducement. It has long been the law that, despite the parol evidence rule, "false and fraudulent representations made to induce a contract, evidenced by a written agreement, may be introduced to defeat its enforcement." *First Nat'l Bank v. Fox*, 40 App. D.C. 430, 436, *cert. denied*, 231 U.S. 751, 34 S.Ct. 322, 58 L.Ed. 466 (1913).[1] The fact that a writing contains an integration clause, standing alone, has not generally been held sufficient to bar evidence of fraudulent inducement either in "commercial" contract disputes[2] or in cases involving "consumer" fraud.[3] The commentators unanimously agree.[4] Those courts that have occasionally found an integration clause sufficient to bar evidence of prior fraud have relied on the presence of an express, usually quite explicit contractual term or disclaimer—nowhere to be found in this contract—that would have been directly contradicted by

1. *Accord, King v. Industrial Bank of Washington*, 474 A.2d 151, 155 (D.C.1984); *Stamenich v. Markovic*, 462 A.2d 452, 455 (D.C.1983); *Ellis v. Morgan*, 65 A.2d 797, 797 (D.C.Mun.App.1949); *Smith v. O'Connor*, 66 U.S.App.D.C. 367, 369, 88 F.2d 749, 751 (1936).

2. *Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 269 (D.C.1987); *Scrimgeour v. Magazine*, 429 A.2d 187, 188 & n. 1 (D.C.1981); *Slater v. Berlin*, 94 A.2d 38, 43 (D.C.Mun.App. 1953); *Robinson v. Carter*, 77 A.2d 174, 177 (D.C.Mun.App.1950); *Owen v. Schwartz*, 85 U.S.App.D.C. 302, 308–09, 177 F.2d 641, 647–48 (1949).

3. *Rouse v. United States*, 94 U.S.App.D.C. 386, 387, 215 F.2d 872, 873–74 (1954); *Kraft v. Lowe*, 77 A.2d 554, 557 (D.C.Mun.App.1950); *Goldsten v. Burka*, 43 A.2d 712, 713–14 (D.C.Mun.App. 1945); *see also Rice v. Rice*, 415 A.2d 1378, 1382 (D.C.1980).

4. 3 A. CORBIN, CORBIN ON CONTRACTS §§ 578, 580 (1960) (parol evidence admissible to establish that completely integrated contract was fraudulently induced); 2 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.4 (1990) (integration clause ineffective to bar parol evidence of antecedent fraudulent misrepresentations); 5 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 811 (1961) (merger clause ineffectual to preclude evidence of prior fraudulent misrepresentations); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 214(d) & Comment c (1981); RESTATEMENT (SECOND) OF CONTRACTS § 238(b) (1932); 32A C.J.S. *Evidence* § 979 (1964).

evidence of the alleged misrepresentation.[5] This court's decision in *Tonn v. Philco Corp.*, 241 A.2d 442 (D.C.1968), is illustrative for there the written employment contract stating that the employment was for no definite term and could be terminated at any time expressly contradicted prior alleged oral representations that the plaintiff would be guaranteed employment for a fixed term.

I am afraid the majority's opinion may be read to upset these principles whenever there is a completely integrated contract, even one evidenced by an integration clause as "wimpy" as this one, *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1545 (7th Cir. 1990), entered into by "sophisticated business institutions dealing with each other on a level playing field." *Ante* at 932. Since I regard the court's entire analysis of the integration clause and parol evidence principles as unnecessary to decide this case, I respectfully concur in the judgment.

---

**5.** *See, e.g., Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).